**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| CHUBB SEGUROS MEXICO S.A. | : | Civil No.: 5:22-cv-01734 |
| *Plaintiff* | : | |
| | : | |
| Versus | : | Judge S. Maurice Hicks |
| | : | |
| TERRAL RIVERSERVICE, INC., | : | |
| ROBERT B. MILLER & ASSOCIATES, | : | |
| INC., CADDO-BOSSIER PARISH PORT | : | |
| COMMISSION and COASTAL CARGO | : | |
| COMPANY, LLC | : | |
| *Defendants* | : | Mag. Judge Mark L. Hornsby |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR**</u>
<u>**SUMMARY JUDGMENT ON BEHALF OF TERNIUM USA, INC.**</u>

Caldwell Roberts, Jr., Bar No. 20343
MAYER, SMITH & ROBERTS, L.L.P.
8570 Business Park Drive, Suite 200
Shreveport, LA  71105
Telephone: (318) 222-2135
Facsimile: (318) 222-6420
Email:  colly@msrlaw.com

*Attorneys for TERNIUM, USA, Inc.*

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………...…iii

I.   Introduction……………………………………………………………………1

II.   Summary Judgment Standard……………………………………...……....2

III.   Principles of General Maritime Law…………………………………..…….2

IV.   Undisputed Facts……………………………………………………....……5

V.   Ternium Was Not Negligent………………………………………...……7

VI.   Ternium Does Not Owe Contractual Defense and Indemnity to Caddo…....…7

VII.   Caddo is Not Ternium's Agent for Whom Ternium is Legally or
     Vicariously Responsible……………………………………….…......12

VIII.   Conclusion……..……………………………………………….…….15

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 US 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)........................ 2

*Donaghey v. Ocean Drilling Exploration Company*,
974 F.2d 646 at 649 (5th Cir. 1992)........................................................... 2

*Celetex Corp. v. Catrett*,
477 US 317, 322, 106 S.Ct. 2448, 2552, 91 L.Ed.2d 265 (1986)...................... 2

*International Shortstop, Inc. v. Rally's*,
939 F.2d at 1263.................................................................................... 2

*Topalian v. Ehrman*,
954 F.2d 1125, 1132 (5th Cir. 1992)........................................................... 2

*Chaves v. Noble Drilling*,
567 F.2d 287, 289 (5th Cir. 1978)............................................................... 2

*Thomas v. Express Boat*,
759 F.2d 444, 448 (5th Cir. 1985)............................................................... 2

*Spinks v. Chevron Oil*,
507 F.2d 216, 223 (5th Cir. 1975)............................................................... 3

*Chisholm v. Sabine Towing and Transport Company*,
679 F.2d 60, 63, (5th Cir. 1982)................................................................. 3

*United States v. Reliable Transfer Company*,
421 US 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).................................... 3

*Consolidated Grain and Barge Company v. Marcona Conveyor Corp.*,
716 F.2d 1077 (5th Cir. 1983)................................................................... 3

*Kenny Marine Towing, Inc. v. M/V John R. Rice*,
583 F.Supp 1196, 1199 (E.D. La. 1984)................................................... 3

*Herd & Co. v. Krawill Machinery Corp.*,
359 U.S. 297 304, 3 L.Ed.2d 820, 79 S.Ct. 766 (1959)................................ 3

iii

*U.S. v. The Bull Steamship Line*,
274 F.2d 877, 880 (2d Cir. 1960)……………………………………………… 4

*Ryan Stevedoring Company, Inc. v. Pan-Atlantic S.S. Corp.*,
350 U.S. 124, 134, 100 L.Ed. 133, 76 S.Ct. 232 (1956)…………………………. 4

*Scindia Steam Navigation Company v. De Los Santos*,
451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981)……………….. 4

*Woods v. Sammisa Company, Ltd.*,
873 F.2d 842, 847 (5th Cir. 1989)…………………………………………… 4

*Howlett v. Birkdale Shipping Co., S.A.*,
129 L.Ed.2d 78, 114 S.Ct. 2057, 2067 (1994)………………………………… 4

*Lemon v. Bank Lines, Ltd.*,
656 F.2d 110 (5th Cir. 1981)………………………………………………… 4

*William J. Quillan v. Atlantic Mutual Insurance Company*,
180 F. 681, 682-84 (2d Cir.)
cert denied, 218 US 682, 31 S.Ct. 229
54 L. Ed. 1208 (1910)………………………………………………………... 5

*Aktieselskabet Fido v. Lloyd Brazilleiro*,
267 F.2d 733, 736-37 (S.D. N.Y. 1919)
affirmed, 283 F. 62 (2d Cir.)………………………………………………… 5

*Corbett v. Daimon M. Drilling Company*,
654 F.2d 329, 333 (5th Cir. 1981)……………………………………....…7, 8, 11, 12

*Foreman v. Exxon Corporation*,
770 F.2d 490, 498 (5th Cir. 1985)…………………………………………… 7

*Weathersby v. Conoco Oil Company*,
752 F.2d 953, 955 (5th Cir. 1984)…………………………………………… 7, 8

*Kemp v. Gulf Oil Company*,
745 F.2d 921, 924 (5th Cir. 1984)…………………………………………… 7

*The Tungus v. Skovgaard*,
358 US 588, 594, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959)…………………………12

*Kossick v. United Fruit Company*, 365 US 731 (1961)…………………………12

iv

*Alcoa SS Company v. Charles Ferran Co,,*
383 F.2d 46 (5th Cir. 1967)………………………………………………13

*Arkwright-Boston MFRS. Mutual Insurance Company v. Energy*
*Insurance Agency, Inc.*, 659 F.Supp. 97 (S.D. Texas 1987)………………13

*Cactus Pipe & Supply v. M/V Montmartre,*
756 F.2d 1103 (5th Cir. 1985)………………………………………………...13

*West India Industries v. Vance & Sons AMC-Jeep,*
671 F.2d 1384 reh'g denied, 679 F.2d 248 (5th Cir. 1982)………………….13

*Kirno Hill Corp. v. Holt,*
618 F.2d 982 (2d Cir. 1980)………………………………………………13

*Interocean Shipping Company v. National Shipping and Trading Corp.,*
523 F.2d 527 (2d Cir. 1975), cert. denied, 423 US 1054,
46 L.Ed.2d 643, 96 S.Ct. 785 (1976)………………………………………...13

*Atl. & Gulf Stevedores v. Revelle Shipping Agency,*
750 F.2d 457 (5th Cir. 1985)………………………………………………13

*McCray v. S. Aggregates, LLC,*
218-1545 (La. App. 1st Cir. 8/29/19),
282 So.3d 262, 268………………………………………………………… 14

*Christiana Tr. v. Riddle*,
911 F.3d 799, 803 (5th Cir. 2018)………………………………………… 14

**Federal Rules and Regulations**

*FRCP 56(c)*… … … … … … … … … … … … … … … … … … … … … … … .. 2

**Other Authorities**

*Schoenbaum, Admiralty and Maritime Law* §4:4 (6th ed)…………………13

## I.      **Introduction**

As appears from the foregoing Statement of Material Facts, Ternium USA, Inc. (hereafter Ternium) merely owned the steel coils and had nothing to do with the selection of the barge managed by Robert B. Miller and Associates, Inc. (hereafter RBM) that leaked and had nothing to do with the loading, transport and unloading of the steel coils.  While Ternium and Caddo-Bossier Port Commission (hereafter Caddo) entered into a Services Agreement for Caddo to provide stevedoring services, there are no facts to support Caddo's claim that Ternium owes contractual defense and indemnification to Caddo.  There are also no facts to support Terral River Service, Inc.'s (hereafter Terral)  allegations that Caddo is Ternium's agent for whom Ternium is legally responsible.  RBM is the only third party plaintiff who asserted allegations of negligence against Ternium, but its President and owner, Robert B. Miller, III, could not provide any facts to show that Ternium was negligent in causing or contributing to any damages.  Mr. Miller testified as follows:

> Q.     So as you sit here giving your deposition, you don't have any specific knowledge of any acts of negligence that Ternium committed that caused any damages to Miller Barge?
>
> A.     Not specifically, no.   (Depo. Robert B. Miller, p. 88, l. 20-24)

He later testified:

> A.     It is my belief that Ternium contributed through its direction in the unloading of the barge as to – that caused the whole incident.
>
> Q.     And where do you get that belief from?
>
> A.     I don't recall.  (Depo. Robert B. Miller, p. 89, l. 21-1)

Of course, the evidence is completely undisputed that Ternium did not direct, control, supervise, or have any right or obligation to direct, control or supervise the unloading procedures.  Simply

put, there is not a scintilla of admissible summary judgment evidence to support any of the three

Third Party Demands against Ternium.

## II.      **Summary Judgment Standard**

Summary judgment is proper if the movant demonstrates the absence of genuine issues of

material fact. *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d

202 (1986). Such a showing entitles the movant to summary judgment as a matter of law. *See*

*FRCP 56(c)*. The movant accomplishes this by informing the court of the basis for its motion, and

by identifying portions of the record which highlight the absence of genuine factual issues.

*Donaghey v. Ocean Drilling Exploration Company*, 974 F.2d 646 at 649 (5th Cir. 1992). If the

movant is successful, the non-movant must then direct the court's attention to evidence in the

record sufficient to establish that there is a genuine issue for trial. *Celetex Corp. v. Catrett*, 477

US 317, 322, 106 S.Ct. 2448, 2552, 91 L.Ed.2d 265 (1986). The non-movant cannot satisfy this

burden merely by denying the allegations in the opponent's pleadings, but can do so by tendering

depositions, affidavits, and other competent evidence to buttress its claim. *See International*

*Shortstop, Inc. v. Rally's*, 939 F.2d at 1263, and *FRCP 56(e)*. Summary judgment is appropriate

if the non-movant fails to set forth specific facts to show that there is a genuine issue for trial.

*Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1992).

## III.      **Principles of General Maritime Law**

In *Donaghey v. Ocean Drilling and Exploration Company*, 974 F.2d 646 (5th Cir. 1992)

the Fifth Circuit Court of Appeal stated:

> Under the general maritime law, a party's negligence is actionable
> only if it is a "legal cause" of the plaintiff's injuries. *See Chaves v.*
> *Noble Drilling*, 567 F.2d 287, 289 (5th Cir. 1978). "Legal cause is
> something more than 'but for' causation and the negligence must be
> a 'substantial factor' in the injury. *Thomas v. Express Boat*, 759
> F.2d 444, 448 (5th Cir. 1985) (citations omitted). The term

2

'substantial factor' means more than but for the negligence, the harm would not have resulted." *Spinks v. Chevron Oil,* 507 F.2d 216, 223 (5th Cir. 1975); *See also: Chisholm v. Sabine Towing and Transport Company,* 679 F.2d 60, 63, (5th Cir. 1982).

974 F.2d at 649.

In the landmark case of *United States v. Reliable Transfer Company,* 421 US 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) the U.S. Supreme Court abolished the doctrine of mutual fault – equal contribution and announced the rule that damages in maritime cases should be apportioned according to comparative fault. The Supreme Court held that, "When two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. *U.S. v. Reliable Transfer,* 421 US at 411, 95 S.Ct. at 1715-16.

Under general maritime law, in a towage situation, the owner of the barge is responsible for the unseaworthiness of his vessel, while those responsible for the handling of the barge or vessel being towed are obligated to perform the tow using such care as a prudent person would under similar situations. *Consolidated Grain and Barge Company v. Marcona Conveyor Corp.,* 716 F.2d 1077 (5th Cir. 1983). Negligence must be shown by proof of specific acts of negligence or proof of a failure to exercise reasonable maritime skill unaided by any presumption of law. *Kenny Marine Towing, Inc. v. M/V John R. Rice,* 583 F.Supp 1196, 1199 (E.D. La. 1984).

Liability of the stevedore is based upon negligence and breach of warranty to perform its duties in a proper and workmanlike manner. Stevedores are liable for the damage caused by their negligence. *Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297 304, 3 L.Ed.2d 820, 79 S.Ct. 766 (1959). Stevedores, moreover, are obligated to exercise whatever degree of care is necessary to discharge cargo without damage, even if the discharge, because of the nature of the cargo and/or

3

the stow, is a difficult undertaking calling for a high degree of professional skill.  *U.S. v. The Bull Steamship Line*, 274 F.2d 877, 880 (2d Cir. 1960).

A stevedore also owes a warranty of workmanlike performance to the vessel.  This warranty is "comparable to a manufacturer's warranty of the soundness of its manufactured product."  A breach of this warranty may entitle the vessel owner to indemnity from the stevedore.  *Ryan Stevedoring Company, Inc. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 134, 100 L.Ed. 133, 76 S.Ct. 232 (1956).

Likewise a vessel owner has certain duties owed to the stevedore.  The vessel owner must exercise ordinary care "to have the ship and its equipment in such a condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety."  *Scindia Steam Navigation Company v. De Los Santos*, 451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981).  A "corollary" of this first duty is that the ship owner must "warn the stevedore of any hazardous conditions on the ship  or with respect to its equipment of which the stevedore cannot be expected to be aware, but of which the vessel has or should have knowledge."  *Woods v. Sammisa Company, Ltd.,*  873 F.2d 842, 847 (5th Cir. 1989), *Scindia*, 451 U.S. 156, 167, 101 S.Ct. at 162.  See also *Howlett v. Birkdale Shipping Co., S.A.,* 129 L.Ed.2d 78, 114 S.Ct. 2057, 2067 (1994), in which it was noted that a vessel owner has a "turnover duty" to warn of latent defects in the cargo stow and cargo area, defined as "hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work".  The Fifth Circuit has held that the vessel's duties under *Scindia* extend to the vessel's cargo and its manner of stowage.  See *Woods v Sammisa Company, Ltd.,* 873 F.2d at 847-49, relying on its earlier ruling in *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110 (5th Cir. 1981).

Under maritime common law in the United States, a cargo owner is under the obligation of informing a carrier of inherent dangers in the cargo of which the cargo owner is aware or ought to be aware and of which the carrier is not aware and cannot reasonably be expected to be aware. *William J. Quillan v. Atlantic Mutual Insurance Company,* 180 F. 681, 682-84 (2d Cir.), cert denied, 218 US 682, 31 S.Ct. 229, 54 L. Ed. 1208 (1910); *Aktieselskabet Fido v. Lloyd Brazilleiro*, 267 F.2d 733, 736-37 (S.D. N.Y. 1919), affirmed, 283 F. 62 (2d Cir.).

## IV.   **Undisputed Facts**

While there are certainly factual disputes regarding the alleged fault of Caddo, Terral, and RBM and how their alleged fault may have caused or contributed to the damages to Ternium's steel coils as well as any damages that were allegedly sustained by Terral and RBM, there is absolutely no dispute regarding the potential liability of Ternium.

The deposition testimony cited in the Statement of Undisputed Facts clearly establishes that during the unloading procedure while the barge was moored to Caddo's dock, the barge slightly listed to the starboard side and therefore, the Port began removing steel coils from the starboard side in an obvious attempt to lessen the load that was causing the slight starboard list. After several coils were removed from the starboard side the barge then took an extreme and sudden list to the port side causing the Port to suspend its unloading operation, remove at least one mooring line, (which the Port had decided to connect to a frontend loader after the initial starboard list) and eventually the other mooring lines broke setting the barge adrift.  Terral then directed the barge to a sandbar in the middle of the Red River in an obvious attempt to prevent catastrophic damage that could be caused by a barge floating uncontrolled downstream.  While the Port was able to remove 11 of the coils before the extreme port side list occurred, the coils that were not

removed from the barge when it broke from its mooring were significantly damaged and could only then be sold for salvage once the coils and barge were eventually brought ashore.

The possible reasons that the barge listed and eventually broke from its moorings include: 1) the free surface effect of water that had been continuous leaking into the barge on its trip to Shreveport, 2) the potential that the barge was bumped by Terral's tugboat during the unloading procedure that may have shifted coils within the hopper causing them to roll from starboard to port, 3) the potential that the coils had not been properly secured by Coastal Cargo when originally loaded, 4) the potential that the barge had not been properly moored tight to the Caddo dock by Caddo during the unloading procedure, and 5) the decision by Caddo to begin unloading the barge without determining the extent of water within the wing tanks and other areas of the barge and without insisting that all water be removed from the barge before unloading could proceed and/or continue.  What is absolutely clear, however, is that Ternium had no right or authority to control the means and methods of Caddo's unloading procedure and had no responsibility whatsoever for the operation of Terral's tugs or the stowage of the cargo by Coastal or the leaking condition of RBM's barge.  Ternium clearly did not dictate the means and methods by which the barge was loaded, transported or unloaded and Ternium did not own the barge.

While RBM has alleged that Ternium basically directed the unloading procedure, such allegations do not have any support whatsoever in evidence.  The deposition testimony is undisputed that Caddo discovered water in the bow of the hopper when it removed the barge covers and then its Director of Operations, Ted Knight, called a Ternium representative, Daniel Vazquez, who was in bed early on Saturday morning, June 26, 2021.  Daniel Vazquez, knowing that water would damage Ternium's steel coils, instructed the Caddo representative who called him, Ted Knight, to wait until he could come observe the conditions of the coils before proceeding with

6

unloading.  Mr. Knight flatly admitted that he failed to follow Mr. Vazquez's request and began unloading the steel coils from the barge before Mr. Vazquez arrived at the Port.

## V.   Ternium Was Not Negligent

Despite a diligent search, undersigned counsel could not locate a single case, published or unpublished, placing, or even alleging responsibility on a cargo owner for a maritime accident due to the means and methods by which his cargo was loaded, shipped and unloaded when the cargo was damaged due to the method by which it was stowed, the conditions of the tow and barge transporting the cargo, or the method by which the cargo was unloaded.  The allegations that Ternium is somehow responsible for the damage to its cargo simply has no support either in fact or in law.  There is simply no basis to impose any duty on Ternium to properly load, transport and/or unload the barge or supervise such activities.  Additionally, Ternium did not breach any duty that caused or contributed to any damages.  Frankly, RBM's claims asserted against Ternium are frivolous.

## VI.   Ternium Does Not Owe Contractual Defense and Indemnity to Caddo

Under federal maritime law, indemnity clauses in maritime contracts are generally enforceable, even for a party's own negligence, as long as the indemnity provision is clear, express, and unambiguous.  *Corbett v. Daimon M. Drilling Company,* 654 F.2d 329, 333 (5th Cir. 1981); *Foreman v. Exxon Corporation*, 770 F.2d 490, 498 (5th Cir. 1985).  A maritime contract containing an indemnity agreement should be read as a whole and its words given their plain meaning unless the provision is ambiguous.  *Weathersby v. Conoco Oil Company*, 752 F.2d 953, 955 (5th Cir. 1984).  Courts "should construe an indemnity clause to cover all losses which reasonably appear to have been within the party's contemplation."  *Kemp v. Gulf Oil Company,* 745 F.2d 921, 924 (5th Cir. 1984).  An indemnity provision should not be read to impose liability for those losses or

liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage. *Corbett v. Daimon M. Drilling Company*, 654 F.2d 329, 333 (5th Cir. 1981).  Interpretation of the terms of a contract is a matter of law.  *Weathersby v. Conoco Oil Company*, 752 F.2d 956 (5th Cir. 1984).

The contract containing the indemnification obligations between Caddo and Ternium was authenticated by Daniel Vazquez in his deposition and was attached to his deposition as Exhibit 24 A, B, & C.  The original document is titled "Services Agreement" and was entered into on November 2, 2005 between Caddo and SteelScape, Inc.  Then on October 16, 2006, the Services Agreement between Caddo and SteelScape was amended in a document titled "Amended Services Agreement".  Finally, on March 1, 1999 a Second Amendment to Services  Agreement was executed between Caddo and Ternium which simply acknowledged that Caddo had previously entered into a services agreement with SteelScape, Inc. on November 2, 2005 and again on October 16, 2006, and acknowledging that SteelScape, Inc. was the predecessor in interests to Ternium USA, Inc.  The only substantive changes to the Second Amendment to Services Agreement that Ternium signed were changes to certain pricing agreements and it stated "All other terms and conditions of the original and amended Services Agreement not specifically excluded or modified hereunder shall remain in full force and effect."  There were no changes to any indemnification obligations in the Second Amendment to Services Agreement.  The original and amended Services Agreement are almost identical and the paragraphs that contain the indemnity obligations are in fact identical.

Both the original and amended Services Agreement contain the following provision:

4.      Port [Caddo] shall not be liable for any loss or injury to any
        products, goods,  commodities, freight or property of any

kind (hereinafter collectively referred to as "property") handled or stored by it for customer or any other loss or injury unless such loss or injury results from the failure of Port [Caddo] to exercise such care as would a reasonably prudent person would under like circumstances and Port [Caddo] is not liable for damages which could have been avoided by the exercise of due care. Where loss or injury occurs to any property handled or stored by Port [Caddo] for customer [Ternium], for which Port [Caddo] is not liable, customer [Ternium] shall be responsible for the cost of removing and disposing of such property and the cost of any environmental cleanup and site remediation resulting from the loss or injury to such property.

Under the provisions of paragraph 4 Caddo would be liable to Ternium for any failure by Caddo to exercise reasonable care. In circumstances where there is a loss to Ternium's property and the Port is not liable for the loss, Ternium must be responsible for the cost of removing and disposing of its property and the cost of any environmental cleanup and site remediation. In this case there is clearly no claim asserted by Caddo for the cost of removing and disposing of Ternium's property.

Paragraph 5 of the original and amended Services Agreement contains the following provision:

5.   In the event any damage or loss occurs to property handled or stored by Port [Caddo] on behalf of customer [Ternium], Port [Caddo] agrees to indemnify and hold customer [Ternium] harmless from and against loss, expense, claim or liability which may be incurred by or asserted against customer [Ternium] with respect thereto only if the damage or loss occurred as a result of Port's [Caddo's] failure to exercise reasonable care in regard to the property stored or handled as a reasonable person would exercise under like circumstances.

If it is shown that Caddo did not handle the property reasonably, Caddo is clearly liable for the loss of Ternium's property and must defend and indemnify Ternium. Ternium has not filed a cross-claim or counter-claim against Caddo in this suit, but this section of the contract, coupled

9

with the facts, would clearly support such a claim.  Of course since Ternium does not handle any

property while it is in transport or in the care of Caddo, there is no provision in the agreement to

require Ternium to assume liability for or defend and indemnify Caddo for Ternium's

unreasonable handling of its own property.  Such a provision would make no senses as the purpose

of the contract between Ternium and Caddo is for Caddo to provide stevedoring services to

Ternium, not vice versa.

Paragraph 6 contains an indemnity obligation owed by Ternium to Caddo when there is a

claim respecting Ternium's "right, title and interest in the property".  This provision provides as

follows:

> 6.     Customer [Ternium] represents and warrants that it is
> lawfully possessed of the property to be handled and stored
> by the Port [Caddo] and has the right and authority to deliver
> such property to or store at Port [Caddo].   Customer
> [Ternium] agrees to indemnify and hold Port [Caddo]
> harmless from all loss, cost and expense (including
> reasonable attorney fees) which Port [Caddo] pays or incurs
> as a result of any dispute or litigation, whether instituted by
> Port [Caddo] or others, **respecting customer's [Ternium's]
> right, title or interest in the property.**  Such amounts shall
> be charged in relation to the goods and subject to Port's
> [Caddo's]  warehouse  and/or lessor's  lien.  **[Emphasis
> added]**

It is undisputed that Ternium owned the steel coils.  Clearly this provision would require Ternium

to defend and indemnify Caddo if Caddo suffered a loss "respecting [Ternium's] right, title or

interest in the property."  However, there is no claim asserted in this litigation respecting Ternium's

interest or ownership of the steel coils.  It is not disputed that Ternium was "lawfully possessed of

the property to be handled and stored by the Port".  This is a suit brought by Ternium's subrogated

insurer for damages to Ternium's coils allegedly caused by Coastal, Caddo, RBM and/or Terral.

Plaintiff has made allegations to support a finding that Caddo acted as an unreasonable stevedore

which, according to the agreement, if proven, will establish contractual indemnity owed by Caddo to Ternium.

Paragraph 7 contains the following indemnity provision:

> 7. Customer [Ternium] will provide Port [Caddo] with information concerning the property which is accurate, complete and sufficient to allow Port [Caddo] to comply with all laws and regulations concerning the storage, handling and transporting the property and will indemnify Port [Caddo] harmless from all loss, costs, penalty and expense (including reasonable attorney's fees), which the Port [Caddo] pays or incurs as a result of customer's [Ternium's] failing to fully discharge this obligation.

There is no allegation or any facts to support any allegation that Ternium failed to provide accurate and complete information regarding the coils that somehow prevented Caddo from being able to comply with all laws and regulations concerning the storage, handling and transporting of the coils. Nor is there any allegation or facts to support any allegation that Caddo failed to comply with any laws and regulations concerning the storage, handling and transporting of the coils. Clearly this paragraph does not trigger any indemnity obligation owed by Ternium to Caddo.

There are no other indemnification provisions contained in the 3 separate documents comprising the contract between Caddo and Ternium. Because the indemnity agreement "should be read as a whole and its words given their plain meaning" and this court "should construe an indemnity clause to cover all losses which reasonably appear to have been within the party's contemplation", there is simply no basis for this court to find that Ternium owes contractual indemnification to Caddo in response to allegations that Caddo acted as a negligent stevedore in the handling of Ternium's coils. As the Fifth Circuit stated in *Corbett, supra*, an indemnity provision "should not be read to impose liability for those losses or liabilities which are neither

expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbett, supra*, 654 F.2d at 33.

**VII.   Caddo is Not Ternium's Agent for Whom Ternium is Legally or Vicariously Responsible**

The applicability of state law is limited to issues not touched by maritime law where state statutes fill in the gap in a manner not destructive of the uniformity admiralty seeks. *The Tungus v. Skovgaard*, 358 US 588, 594, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959). In his treatise, Admiralty and Maritime Law, Professor Thomas Schoenbaum stated:

> Despite this ringing affirmation of the authority and necessity of federal maritime law, *Jensen* does not mandate the application of solely federal rules in admiralty decisions. On the contrary, the general maritime law is not a complete legal system; there are numerous gaps that must be filled either by the federal judiciary, in making up new rules of law, or by the application of state law. Although the federal judiciary has the power to announce new principles of general maritime law, this is done very infrequently and only when there is a compelling need to fashion new rules. Furthermore, the demand for uniformity in admiralty is not inflexible and does not preclude the balancing of competing state, national, and international interest.
>
> In the years since *Jensen*, the Supreme Court has made clear that the uniformity principle does not preclude the application of state law in admiralty. Rather, the decision whether to apply a state rule must be based upon balancing state and federal interest. In *Kossick v. United Fruit Company*, the court explained this process as follows:
>
>> The fact that maritime law is – in a special sense at least, federal law, and is therefore supreme by virtue of Article VI. of the U.S. Constitution, carries with it the implication that whenever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing or significant. But the process is surely rather one of accommodation, …a process… analogous to the normal conflict of laws situation where two sovereignties assert divergent interest in a transaction action as to which both have some concern.

12

. . .

> First, since the body of federal maritime statutes and judicially
> created general maritime law is not a complete system, judges in
> admiralty cases frequently adopt state law rules through a process of
> "borrowing" thereby incorporating state law doctrines into the
> general maritime law.  This "borrowing" process may be extensive;
> for example, much of general maritime tort law is borrowed state
> law.  The borrowing may, however, be more limited.  For example,
> the general maritime law borrows state agency law.

*Schoenbaum, Admiralty and Maritime Law* §4:4 (6th ed)

In *Alcoa SS Company v. Charles Ferran Co,*, 383 F.2d 46 (5th Cir. 1967) the Fifth Circuit

Court of Appeal relied upon *Tungus, supra,* to apply Louisiana's direct action statute in a general

maritime case.   In *Arkwright-Boston MFRS. Mutual Insurance Company v. Energy Insurance*

*Agency, Inc.*, 659 F.Supp. 97 (S.D. Texas 1987) the court reviewed numerous cases seeking to

determine whether or not there is federal maritime law on agency.  The court stated:

> Other cases that create a federal maritime law on agency  do so to
> the limited extent of establishing a uniform jurisprudence by which
> agents acting in traditional maritime functions are governed. *Cactus*
> *Pipe & Supply v. M/V Montmartre*, 756 F.2d 1103 (5th Cir. 1985)
> (charter party broker); *West India Industries v. Vance & Sons AMC-*
> *Jeep*, 671 F.2d 1384 reh'g denied, 679 F.2d 248 (5th Cir. 1982)
> (stevedore); *Kirno Hill Corp. v. Holt,* 618 F.2d 982 (2d Cir. 1980)
> (charter party broker); *Interocean Shipping Company v. National*
> *Shipping and Trading Corp.,*  523 F.2d 527 (2d Cir. 1975), cert.
> denied, 423 US 1054, 46 L.Ed.2d 643, 96 S.Ct. 785 (1976) (charter
> party broker). Only in *Interocean* was maritime insurance obviously
> an element of dispute, and there New York law governed in
> determining  the validity of the agreement. 523 F.2d at 537-38.  This
> court  cannot find that a federal maritime law on agency exists or
> that one should be fashioned to serve the minimal maritime interest
> here.  See *Wellborn, supra*, at 314.  Inland law must be applied to
> adjudicate the issues in this litigation.  659 F.Supp. at 99.

In *Atl. & Gulf Stevedores v. Revelle Shipping Agency*, 750 F.2d 457 (5th Cir. 1985) the Fifth Circuit

Court of Appeal looked to the Restatement of the Law of Agency to decide the case before it.

The requirements of establishing an agency arrangement under Louisiana law are clear:

> An agency relationship is never presumed; it must be clearly established.  The burden of proving apparent authority is on the party seeking to bind the principal.  A third party may not blindly rely on the assertion of an agent, but has an affirmative duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent.  One must look from the viewpoint of the third party to determine whether an apparent agency has been created.  *McCray v. S. Aggregates, LLC*, 218-1545 (La. App. 1st Cir. 8/29/19), 282 So.3d 262, 268.

Thus, per *McCray*,  proving an agency arrangement under Louisiana law requires a showing of specific facts:

> An agent is one who acts for or in place of another (the principal) by authority from the latter. An agency relationship may be created by express appointment of a mandatary under Article 2985 or by implied appointment arising from apparent authority. Therefore, an agent's authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct. As between principal and agent, the limit of an agent's authority to bind the principal is governed by the agent's actual authority; however, as between principals and third parties, the limit of an agent's authority to bind the principal is governed by the agent's apparent authority.
>
> Implied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal. Apparent agency arises when the principal has acted so as to give an innocent third party a reasonable belief that the agent had the authority to act for the principal, and the third party reasonably relies on the manifested authority of the agent. Apparent agency is established by the words and conduct of the parties and the circumstances of the case. An agency relationship may be created even though there is no intent to do so.

*McCray, supra*, at 267-68.

In *Christiana Tr. v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) the Fifth Circuit Court of Appeal held that a pleading alleging liability via an agency theory must plead specific facts to establish the existence of agency.  Terral has not pled a single fact which could in any way be

construed to create an agency relationship between Caddo and Ternium.  Terral has not pled facts that would establish any actual agency agreement was made and agreed to between Caddo and Ternium so as to "bind" or otherwise hold Ternium legally responsible for Caddo's alleged acts or omissions in unloading the steel coils.  Clearly there is nothing in the Services Agreements between Ternium and Caddo to support a finding that Caddo was Ternium's agent.  The agreements are clear that Ternium was merely Caddo's "customer".  The deposition testimony in this case is undisputed that Ternium had no right to control the means and methods by which Caddo unloaded barges containing Ternium's cargo.  Moreover, Ted Knight has candidly admitted that if he had thought that the unloading procedures could not be safely performed, but Ternium nevertheless insisted that the unloading proceed, he would have refused to do so.  There is simply no basis for holding Ternium directly negligent or imposing responsibility on Ternium for Caddo's alleged negligent acts.

**VIII.   <u>Conclusion</u>**

For the foregoing reasons, there is simply no basis in fact or law to impose liability against Ternium for the loss of its coils or any damages RBM or Terral, allegedly directly sustained. Caddo has not alleged it sustained its own damages.  Caddo instead bases its third party demand against Ternium on an alleged contractual indemnification obligation.  However, the contract upon which Caddo relies to support its indemnity obligation simply does not impose any indemnity obligation on Ternium for the subject loss.  There are no facts pled or in existence to support a finding that Caddo was Terral's agent.  Therefore, the three Third Party Demands filed against Ternium by RBM, Caddo and Terral should be dismissed, with prejudice, and at the cost of RBM, Caddo and Terral.

Respectfully submitted,

MAYER, SMITH & ROBERTS, L.L.P.
Attorneys for TERNIUM, USA, Inc.

By:  *s/Caldwell Roberts, Jr.*
     Caldwell Roberts, Jr., Bar No. 20343
     8570 Business Park Drive, Suite 200
     Shreveport, LA  71105
     Telephone:    (318) 222-2135
     Facsimile:     (318) 222-6420
     colly@msrlaw.com

# **C E R T I F I C A T E**

I HEREBY CERTIFY that a copy of the above and foregoing has been filed electronically

with the Clerk of Court using the CM/ECF system and has been sent to all known counsel of record

by operation of the court's electronic filing system, e-mail, facsimile, or by replacing same in the

United Sates mail properly addressed and with adequate postage prepaid thereon.

Shreveport, Louisiana, this 19th  day of April, 2023.


                    */s/ Caldwell Roberts, Jr.*