UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| CHUBB SEGUROS MEXICO S.A. | : | Civil No.: 5:22-cv-01734 |
| *Plaintiff* | : | |
| Versus | : | Judge S. Maurice Hicks |
| TERRAL RIVERSERVICE, INC., ROBERT B. MILLER & ASSOCIATES, INC., CADDO-BOSSIER PARISH PORT COMMISSION and COASTAL CARGO COMPANY, LLC | : : : : | |
| *Defendants* | : | Mag. Judge Mark L. Hornsby |

**STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I. **Undisputed facts based on the 2/14/23 deposition testimony of Ted Knight (Exhibit A)**

1. Ted Knight was the Director of Operations for the Caddo-Bossier Port Commission [hereafter Caddo] on June 26, 2021 (Exhibit "A" Depo. Ted Knight, p. 12, l. 15-18).

2. Caddo provides stevedoring services to the public (Depo. Ted Knight, p. 20, l. 11).

3. Caddo holds itself out as being a stevedore, which has experience and capability to unload steel cargoes from barges at its terminal (Depo. Ted Knight, p. 20, l. 12-15).

4. One of Ted Knight's duties was overseeing stevedoring at Caddo's terminal facility (Depo. Ted Knight, p. 20, l. 25- p. 21, l. 3).

5. Mr. Knight was in charge of directing the stevedores at Caddo as to how they were to unload steel coils from barges (Depo. Ted Knight, p. 21, l. 4-7).

6. The decisions as to the means, methods, and procedures for unloading steel coil for barges at Caddo's terminal were made by Ted Knight (Depo. Ted Knight, p. 26, l. 1-5).

7. Caddo does not allow its customers to come to its terminal facility and direct its stevedores as to what means, methods, and procedures are used to unload a barge (Depo. Ted Knight, p. 26, l. 6-10).

8. The Caddo stevedores are not allowed to take direction from visitors who are not Caddo employees or managers (Depo. Ted Knight, p. 26, l. 25 – p. 27, l. 3).

9. Mr. Vazquez is a representative of Ternium USA, Inc. [hereafter Ternium] whom Mr. Knight has known for approximately 10 years (Depo. Ted Knight, p. 35, l. 16 – p. 36, l. 1).

10. Ternium is a customer of Caddo and Mr. Daniel Vazquez is Ternium's representative in Shreveport (Depo. Ted Knight, p. 36, l. 3-9).

11. Mr. Vazquez is the person Mr. Knight would contact first if he had any need to get in touch with Ternium (Depo. Ted Knight, p. 36, l. 10-13).

12. There was no difference between unloading coils for Ternium versus other companies (Depo. Ted Knight, p. 39, l. 6-8).

13. It is Caddo's job to be the expert in unloading cargo from barges (Depo. Ted Knight, p. 40, l. 34 – p. 41, l. 2).

14. Caddo provides the expertise on barge unloading and stevedoring (Depo. Ted Knight, p. 41, l. 7-9).

15. A customer has no control over Caddo's employees and cranes as to how the coils are to be discharged (Depo. Ted Knight, p. 42, l. 22 – p. 43, l. 4).

16. Caddo was acting as stevedore for Ternium on the day of the incident (Depo. Ted Knight, p. 52, l. 5-8).

17. Ternium was Caddo's customer on the day of the incident (Depo. Ted Knight, p. 52, l. 9-11).

18. Ternium did not own the barge the steel coils were on (Depo. Ted Knight, p. 52, l. 12-18).

19. Ternium did not have any operational control over the tug boat bringing the barge to Caddo (Depo. Ted Knight, p. 55, l. 4-7).

20. Ternium did not have any actual awareness as to the condition of the barge or the cargo inside after it was loaded in New Orleans (Depo. Ted Knight, p. 55, l. 15-24).

21. When Mr. Knight arrived at Caddo's facility on the morning of June 26, 2021, the barge was already there and there was no representative from Ternium present (Depo. Ted Knight, p. 57, l. 2-7).

22. It was customary for Caddo to unload cargo from barges without having a representative of the cargo present (Depo. Ted Knight, p. 57, l. 8-15).

23. When the Caddo employees opened the barge covers and looked into the barge, they observed water in the bottom of the barge that was not supposed to be there (Depo. Ted Knight, p. 63, l. 4-10).

24. The water was located in the barge hopper where the cargo is placed (Depo. Ted Knight, p. 63, l. 8-20).

25. The decision to unload the coils before pumping out the water in the barge or pumping out the water in the barge before unloading is not a decision of the customer, but was a decision that Ted Knight made as the person in charge of the stevedoring and unloading operation (Depo. Ted Knight, p. 71, l. 10-22).

26. The customer does not tell Caddo how to discharge the cargo or the means and methods to do so, but only whether or not the customer wants the cargo discharged (Depo. Ted Knight, p. 71, l. 25 – p. 72, l. 6, See also Depo. Ted Knight, p. 73, l. 6-21).

27. Mr. Knight called Daniel Vazquez at 7:07 a.m. to report to him that there was water in the barge (Depo. Ted Knight, p. 106, l. 1-10, See also p. 108, l. 10-14).

28. Mr. Vazquez stated he was going to come down and take a look and then decide what to do (Depo. Ted Knight, p. 109, l. 19-23, See also p. 113, l. 9-10).

29. Mr. Knight's recollection was that Mr. Vazquez did not want Caddo to start the discharge until he viewed the coils. However, Mr. Knight confirmed that Caddo initiated the discharge of coils before Daniel came to the Port (Depo. Ted Knight, p. 113, l. 19 – p. 115, l. 4).

30. While Daniel wanted to proceed with the discharge of the coils, there was no discussion about the means and methods of how to discharge the barge and no discussion with Daniel regarding how to discharge the barge or anything to do with inspecting the barge (Depo. Ted Knight, p. 128, l. 12-20).

31. There were no instructions from Ternium about how to actually perform the unloading process or how to address any concerns with the barge or with any stevedoring practice (Depo. Ted Knight, p. 132, l. 14-19).

32. At 7:53:39 a.m. the barge started to roll to the river side (Depo. Ted Knight, p. 134, l. 21 – p. 135, l. 5).

3

33. Caddo continued to unload the barge lifting coils from the starboard/river side when the barge then listed or rolled to the Port/Caddo wharf side at 8:27 a.m., which Mr. Knight believed occurred because the water in the barge shifted from starboard to port (Depo. Ted Knight, p. 148, l. 16 – p. 149, l. 11).

34. Mr. Daniel Vazquez did not come to the Caddo dock until after the discharge of the steel coils had already begun (Depo. Ted Knight, p. 167, l. 10 – p. 168, l. 6, See also Depo. Ted Knight, p. 236, l. 6-16, and p. 237, l. 11- p. 238, l. 5).

35. Mr. Ted Knight does not know why he started unloading the coils before Daniel came down to the Caddo Port (Depo. Ted Knight, p. 239, l. 8-15).

36. Mr. Daniel Vazquez arrived at the Port at 7:26 a.m. and approximately 3 coils had been removed as of 7:27 a.m. (Depo. Ted Knight, p. 257, l. 25 – p. 258, l. 9).

37. In the interim between 7:00 a.m. and 8:27 a.m. when the barge listed to port, the barge had also listed to starboard (Depo. Ted Knight, p. 260, l. 13-17).

38. If there had been any concern with the stability of the barge, with water in the hopper, Mr. Knight, as an expert stevedore, could have stopped the process of removing coils, but did not do so (Depo. Ted Knight, p. 262, l. 9-18).

39. Mr. Knight felt that it was safe to remove the coils starting at 7:18 a.m. (Depo. Ted Knight, p. 262, l. 19-22).

40. Mr. Knight knew before 7:53 a.m. when the barge shifted to starboard that there were pumps in the barge (Depo. Ted Knight, p. 267, l. 6-13).

41. When Mr. Knight received the information that there were pumps on the barge he requested that the tow boat come back and commence pumping again (Depo. Ted Knight, p. 267, l. 24 – p. 268, l. 21).

42. However, Mr. Knight continued removing coils, not waiting for the tow boat to come back to the barge to begin pumping or do anything else (Depo. Ted Knight, p. 268, l. 22 – p. 269, l. 1).

43. Prior to the barge listing to starboard, Mr. Knight had no concerns about the stability of the barge (Depo. Ted Knight, p. 282, l. 17-21).

44. When the barge made a shift to starboard at 7:53 a.m. Mr. Knight got everyone off the barge (Depo. Ted Knight, p. 283, l. 2-9).

45. When at 7:53 the barge shifted outboard [starboard] Mr. Knight ordered another line be put on the forward part of the barge and another line put on the stern part of

4

the barge, and used a loader to tighten the stern line, *i.e.,* he put 2 more lines on the barge and continued lifting coils out of the barge (Depo. Ted Knight, p. 284, l. 23 – p. 285, l. 18).

## II. Undisputed facts based upon the 3/7/23 deposition testimony of Ted Knight (Exhibit B)

46. Mr. Knight was never advised by Terral or anyone else before the barge arrived at Caddo that there were any problems with the barge, that the barge was leaking or had water in the wing tanks or had water in the hopper (Depo. Ted Knight, p. 323, l. 12-22).

47. Mr. Knight was not aware that the barge had not had a patch job on its way to Shreveport while it was in Baton Rouge and that Terral had received instructions to monitor the barge and pump as needed on the trip to Shreveport (Depo. Ted Knight, p. 323, l. 23 – p. 324, l. 7; see also p. 325, l. 9 – p. 326, l. 5).

48. The barge in question, GBW 97 had previously arrived with a load of steel coils with water in the hopper in November of 2020 (Depo. Ted Knight, p. 331, l. 18 – p. 333, l. 9).

49. Based upon his experience in unloading the subject barge with water in it in November of 2020, Mr. Knight believed he could safely discharge the barge on June 26, 2021 (Depo. Ted Knight, p. 334, l. 13-17).

50. When Mr. Knight started discharging the coils from the barge he did not have any concern about Caddo's ability to discharge the coils safely (Depo. Ted Knight, p. 337, l. 8-12).

51. At 7:53 a.m. on the morning of June 26, 2021, while removing the fifth coil from the barge, the barge took a list to the starboard side towards the river (Depo. Ted Knight, p. 343, l. 8-16).

52. While it is common for a barge to move a little bit to one side or the other when discharging coils, this starboard side list was more than he normally sees (Depo. Ted Knight, p. 343, l. 17 – p. 344, l. 1).

53. Mr. Knight believed the barge listed to starboard at this point based upon the stowage and the water in the barge (Depo. Ted Knight, p. 344, l. 2-5).

54. After the barge listed towards starboard a frontend loader was brought out and a line was tied from the stern of the barge to the frontend loader (Depo. Ted Knight, p. 345, l. 5-11).

5

55. After the barge listed to starboard and an auxiliary line was attached, Mr. Knight had no concerns about the safety of proceeding with the discharge of the coils (Depo. Ted Knight, p. 345, l. 9-15).

56. In Mr. Knight's opinion it would have been appropriate to continue lifting coils from the starboard side to correct the starboard side list (Depo. Ted Knight, p. 346, l. 13 – p. 347, l. 13).

57. At 8:24 a.m. Caddo lifted the eleventh coil from the starboard side of the barge (Depo. Ted Knight, p. 354, l. 19 – p. 355, l. 1).

58. At 8:26 to 8:27 the Terral tug was alongside the barge and was moving down the side of the barge and it looked to Mr. Knight like the Terral tug was on the barge itself (Depo. Ted Knight, p. 366, l. 20 – p. 367, l. 6).

59. It appeared to Mr. Knight from his review of the surveillance video that there was contact between the Terral tug and the barge at 8:27:13, 8:27:29 and 8:27:40 (Depo. Ted Knight, p. 368, l. 5-19).

60. After the barge rolled to port Mr. Knight instructed his workers to sever the line on the frontend loader (Depo. Ted Knight, p. 374, l. 3-7).

61. When the barge rolled to port a couple of the mooring lines snapped (Depo. Ted Knight, p. 374, l. 11-13).

62. The barge remained at the Caddo wharf for about an hour before it broke away (Depo. Ted Knight, p. 385, l. 19-24).

63. Mr. Knight believed that the only reason Daniel Vazquez would have asked Caddo to stop discharging the coils is because the coils were rusted or if it started to rain and the coils would get wet (Depo. Ted Knight, p. 503, l. 3 – p. 505, l. 2).

64. Mr. Knight did not provide any information to Mr. Vazquez that would have given him a reason to think that the discharge of the coils from the barge should be stopped (Depo. Ted Knight, p. 505, l. 3-15).

65. If Mr. Knight had known of the water in the wing tanks of the barge, the potential that some of the chocks were not secured and that as he proceeded with the unloading operation, he was going to have water sloshing from port to starboard and perhaps have coils rolling from port to starboard and therefore decided it was not safe to proceed with the unloading procedure and Mr. Daniel Vazquez had instructed him to proceed with unloading anyway, he would not have done so and would have stopped the operation (Depo. Ted Knight, p. 515, l. 12-22).

6

66. Once Caddo is given the go ahead to unload the coils it is Caddo's discretion to proceed with the discharge and Caddo can override their customer's wishes depending on whether or not Mr. Knight believes the discharge can be safely performed (Depo. Ted Knight, p. 516, l. 4-20).

### III. Undisputed facts based on deposition testimony of John Chandler (Exhibit C)

67. In June of 2021, Mr. Chandler was employed by Budwine & Associates (Depo. John Chandler, p. 10, l. 9-25).

68. Mr. Chandler performed a June 14, 2021 inspection of the GBW97 barge (Depo. John Chandler, p. 23, l. 15-23).

69. The entity he was representing for his inspection was Terral River Services (Depo. John Chandler, p. 24, l. 21-24).

70. The barge was located around mile marker 226 in the lower Mississippi River, just below Baton Rouge (Depo. John Chandler, p. 26, l. 8-13).

71. Mr. Chandler arrived on location at 1640 hours with 2 divers with him. He discovered water in the barge and noted that the barge was down by the head [front] by a foot and a half (Depo. John Chandler, p. 29, l. 7 – p. 30, l. 7).

72. Mr. Chandler began using 3 pumps to pump water from the tanks (Depo. John Chandler, p. 30, l. 14-25).

73. It took until approximately 4:00 in the morning to pump the water from the barge (Depo. John Chandler, p. 31, l. 24 – p. 32, l. 7). There was a foot of water in the No. 1 tank, two feet of water in the No. 2 tank, three feet of water in the No. 3 tank, and two inches of water in the No. 4 tank (Depo. John Chandler, p. 33, l. 12-16).

74. The hopper is where the cargo is stored and the wing tanks are on either side of the hopper as well as under the bottom of the hopper (Depo. John Chandler, p. 33, l. 17 – p. 34, l. 8).

75. There is no baffle or wall longitudinally in the barge to separate the port side and the starboard side of the wing tanks and therefore, water can move freely back and forth in the wing tanks (Depo. John Chandler, p. 34, l. 9-21).

76. There was two feet of water found in the bow void (Depo. John Chandler, p. 35, l. 7-9).

77. Mr. Chandler had to wait for the water in the tanks to go down to a certain degree before he could find the leaks (Depo. John Chandler, p. 36, l. 13-15).

7

78. Mr. Chandler found a 1/8th inch hole at the No. 1 bulkhead and patched it with shingles and epoxy on the inside as they could not patch the outside due to it being turned into the tow boat at this location (Depo. John Chandler, p. 39, l. 4-19).

79. Mr. Chandler had brought the water down from two feet to one inch because he could not pump anymore water after the water goes down to one inch deep (Depo John Chandler, p. 39, l. 20 – p. 40, l. 2).

80. Mr. Chandler found another two inch hole through the port side which was patched with epoxy and shingles so that the leak was then 90% contained, but was continuing to leak some water (Depo. John Chandler, p. 40, l. 5-15).

81. Mr. Chandler also found a third hole that was 2 inches in diameter which was also patched from the inside with epoxy and shingles (Depo. John Chandler, p. 40, l. 17-23).

82. Mr. Chandler did not find any damage to cause leaks in the No. 4 tank, but the No. 4 tank did have two inches of water in it (Depo. John Chandler, p. 41, l. 10-15).

83. After finishing up with the squeegee and mopping, there was 1/8th of an inch of water left in the hopper that could not be removed (Depo. John Chandler, p. 42, l. 5-8).

84. Because the patches were temporary, there was still a chance that the patch could be knocked out so Mr. Chandler left a pump with the tow boat deckhands so they could monitor the leaks every hour or so (Depo. John Chandler, p. 43, l. 25 – p. 44, l. 7).

85. Because the repairs were not 100% effective and Mr. Chandler knew that water was going to continue to get into the wing tanks and epoxy and shingle patches can become dislodged, he instructed both captain and crews of both tugs to look into the wing tanks with a flashlight to make sure the water levels are not increasing and if they are increasing to turn a pump on and this procedure should be done every hour (Depo. John Chandler, p. 45, l. 2 – p. 46, l. 18).

86. Mr. Chandler estimated that it would take 4 to 5 days to get the barge to Shreveport and believed that his temporary repairs would keep water out of the wing tanks until they could make it to Shreveport (Depo. John Chandler, p. 47, l. 4-13).

87. If a wing tank had more than a foot and a half of water in it, it is going to be up against the hopper and if there are any cracks or leaks in the hopper, water can seep through into the hopper (Depo. John Chandler, p. 66, l. 18-25).

88. All 3 patches Mr. Chandler performed were about 90% effective in stopping the leaks (Depo. John Chandler, p. 67, l. 1-10).

89. Mr. Chandler could not guarantee that he had found every leak (Depo. John Chandler, p. 68, l. 7-23, see also p. 69, l. 6-24).

90. Mr. Chandler had no further involvement with the barge between his June 14, 2021 inspection and when he got involved in the effort to remove the coils from the barge in Shreveport (Depo. John Chandler, p. 80, l. 10-15).

91. Mr. Chandler arrived in Shreveport on June 30, 2021 and found the barge sitting on its port side on a sand bar in the Red River approximately 200 yards from the Caddo facility, which was roughly mid-stream in the Red River (Depo. John Chandler, p. 82, l. 14 – p. 83, l. 6).

92. All of the holes Mr. Chandler found in the barge during his June 14, 2021 inspection were due to age and rust (Depo. John Chandler, p. 92, l. 18 – p. 94, l. 1).

93. There was free communication between the No. 2 and No. 3 wing tanks, meaning that if water got into the No. 2 tank, it could go into the No. 3 tank and vice versa (Depo. John Chandler, p. 94, l. 13-21).

94. Since Mr. Chandler initially discovered 2 feet of water in the front bow tank and the hopper floor was 1-1/2 feet above the bottom of the barge, a half foot of water could migrate into the hopper through any sort of a hole or a crack between the hopper and the bow tank (Depo. John Chandler, p. 95, l. 18 – p. 96, l. 16).

95. If the barge had run aground during its trip to Shreveport, that could compromise the integrity of the temporary repairs that Mr. Chandler estimated were reducing the water flow by 90% (Depo. John Chandler, p. 125, l. 21 – p. 126, l. 21).

96. A visual inspection of the hopper, which Mr. Chandler performed, will not always reveal cracks in a weld (Depo. John Chandler, p. 149, l. 9-15).

97. When a barge is moving and is subjected to different stresses in the river, there may be cracks in a weld that are invisible to the naked eye, but may open up and allow water in (Depo. John Chandler, p. 149, l. 16-21).

IV. **Undisputed facts based on the deposition testimony of Daniel Vazquez (Exhibit D)**

98. Mr. Daniel Vazquez is employed by Ternium USA (Depo. Daniel Vazquez, p. 10, l 3-12).

99. Mr. Vazquez is a logistics manager for Ternium (Depo. Daniel Vazquez p. 14, l 10).

100. As a logistics manager, Mr. Vazquez's duties include managing the plant warehouses as well as outside plant warehouses (Depo. Daniel Vazquez, p. 15, l. 12 – p. 16, l. 5).

101. Mr. Vazquez was the logistics manager for Ternium on June 26, 2021 (Depo. Daniel Vazquez, p. 16, l. 14-17).

102. Mr. Vazquez is familiar with the services agreement between Ternium and the Port of Caddo/Bossier (Depo. Daniel Vazquez, p. 17, l. 1-15).

103. Mr. Vazquez identified the service agreement between the Caddo/Bossier Port and Ternium as Exhibits 24A, B and C (Depo. Daniel Vazquez, p. 19, l. 6 – p. 22, l. 17).

104. Daniel Vazquez's home is about a 10 minute drive to the Caddo/Bossier Port (Depo. Daniel Vazquez, p. 39, l. 12-16).

105. Mr. Vazquez received a phone call from Ted Knight at his home and Mr. Knight advised that they had opened a barge which had water in it (Depo. Daniel Vazquez, p. 39, l. 8 – p. 40, l. 1).

106. The phone call Mr. Vazquez received from Ted Knight advising that there was water in the barge was at 7:07 a.m. on June 26, 2021 (Depo. Daniel Vazquez, p. 40, l. 2-11).

107. Mr. Vazquez asked Mr. Knight to send a photo and to wait for him to come to the Port to see what needed to be done (Depo. Daniel Vazquez, p. 40, l. 12-17).

108. Mr. Vazquez did not tell Mr. Knight to go ahead and start removing the coils (Depo. Daniel Vazquez, p. 40, l. 19-22).

109. The only instructions Daniel Vazquez gave to Ted Knight during this initial phone call was to wait (Depo. Daniel Vazquez, p. 40, l. 23-25).

110. During his communications with Terral River Services during the shipment of the GBW97 Barge from New Orleans to Shreveport to determine the estimated time of arrival, Mr. Vazquez never received any information about the condition of the cargo, the condition of the barge, water being in the hopper of the barge, repairs to the barge done in Baton Rouge, any survey of the barge, the draft of the barge, the pumping of the barge, the grounding of the barge or any other such facts other than

10

the estimated time the barge would arrive (Depo. Daniel Vazquez, p. 41, l. 16 – p. 43, l. 18).

111. Exhibit 17 is Mr. Vazquez's call log showing the calls he made and received on June 26, 2021 (Depo. Daniel Vazquez, p. 46, l. 10 – p. 47, l. 19).

112. Mr. Vazquez arrived at the Port at 7:26 a.m. (Depo. Daniel Vazquez, p. 48, l. 12-15).

113. The Port began unloading steel coils from the barge before Mr. Vazquez arrived at the Port (Depo. Daniel Vazquez, p. 52, l. 20 – p. 54, l. 3).

114. Mr. Vazquez never received any information about any problems with the barge prior to him receiving the call from Mr. Ted Knight (Depo. Daniel Vazquez, p. 68, l. 23 – p. 69, l. 3).

115. Mr. Vazquez was asleep in his bed at his house when he received the first phone call from Ted Knight (Depo. Daniel Vazquez, p. 166, l. 7-18).

116. Mr. Vazquez did not have any concern about whether or not the barge would roll because it is beyond his expertise (Depo. Daniel Vazquez, p. 169, l. 8-13).

117. During Mr. Vazquez's observations on the morning of June 26, 2021 the barge was in control of the Port and its employees who were offloading the coils (Depo. Daniel Vazquez, p. 169, l. 19-23).

118. It was never brought to his attention on the morning of June 26, 2021 that there was a problem with the stability of the barge (Depo. Daniel Vazquez, p. 170, l. 18-23).

119. Mr. Vazquez was not paying attention to what the stevedores were doing, but was focusing on the condition of the coils that were dripping water as they were taken by the crane (Depo. Daniel Vazquez, p. 171, l. 17 – p. 172, l. 4).

120. Mr. Vazquez's role on the morning of June 26, 2021 was to report to the Ternium team on the condition of the material and then follow up if there was something that could be done with the material (Depo. Daniel Vazquez, p. 190, l. 21 – p. 191, l. 7).

121. Ternium relied on the Port to unload the barge correctly (Depo. Daniel Vazquez, p. 202, l. 8-11).

122. To Mr. Vazquez's knowledge, no one at Ternium has experience in unloading barges, stevedore operations, what lines to use or how to calculate the stability of a barge (Depo. Daniel Vazquez, p. 209, l. 5 – p. 210, l. 17).

123. Ternium hired the Caddo Bossier Port to unload the barge (Depo. Daniel Vazquez, p. 212, l. 12-19).

124. Nobody from the Caddo Bossier Port asked Mr. Vazquez how to unload the barge (Depo. Daniel Vazquez, p. 212, l. 20-23).

125. Mr. Vazquez was never asked how to perform the unloading operation and did not give any advice on how to properly unload the barge (Depo. Daniel Vazquez, p. 213, l. 11-19).

126. Mr. Vazquez did not have any reason to believe that the Caddo Bossier Port Commission did not know how to unload the barge (Depo. Daniel Vazquez, p. 213, l. 20-24).

127. Ternium relies on Caddo Bossier Port to know what to do when it comes to getting Ternium's coils off the barges (Depo. Daniel Vaquez, p. 214, l. 1-4).

128. If there was an issue with regard to the barge's stability, Mr. Vazquez would have expected the stevedores at Caddo Bossier Port to handle that (Depo. Daniel Vazquez, p. 217, l. 10-13).

129. If the Caddo Bossier Port considered that the discharge should be stopped, Mr. Vazquez would have expected the Caddo Bossier Port to tell him that (Depo. Daniel Vazquez, p. 217, l. 14-17).

130. Mr. Vazquez never gave any instructions to any stevedores or any of the Caddo Bossier Port workers at all about how to do their job (Depo. Daniel Vazquez, p. 218, l. 4-8).

131. Mr. Vazquez does not have any knowledge of the means and methods of how to deal with a barge in distress such as the barge at issue (Depo. Daniel Vazquez, p. 220, l. 14-18).

132. Mr. Vazquez did not know if the barge could have been saved or what the Caddo Bossier Port should have done or should not have done (Depo. Daniel Vazquez, p. 220, l. 19 – p. 221, l. 2).

133. Mr. Vazquez was never told by anyone at Caddo Bossier Port that he was under an obligation to provide the Port with advice on the means and methods of unloading a barge (Depo. Daniel Vazquez, p. 225, l. 20-23).

134. Ternium does not train Mr. Vazquez or other employees in his position to be knowledgeable with regard to the means and methods of unloading a barge (Depo. Daniel Vazquez, p. 225, l. 24 – p. 226, l. 2).

135. No one from the Port of Caddo Bossier told Mr. Vazquez on the morning of June 26, 2021 that the discharge of coils needed to be stopped (Depo. Daniel Vazquez, p. 231, l. 8-14).

V. **Undisputed Facts Based on the Deposition Testimony of Robert B. Miller, III (Exhibit E)**

136. Mr. Miller is President of Robert B. Miller and Associates, Inc. (Depo. Robert B. Miller, III, p. 10, l. 20).

137. Mr. Miller does not have any specific knowledge of any acts of negligence that Ternium committed that caused any damages to Miller Barge (Depo., Robert B. Miller, III, p. 88, l. 20-24).

138. Mr. Miller believes that Ternium contributed to the incident by directing the unloading of the barge, but he does not know why he believes Ternium was directing the unloading of the barge (Depo. Robert B. Miller, III, p. 89, l. 15 – p. 90, l. 1).

139. Mr. Miller was not aware that Ted Knight testified that he would not take direction on the means and methods of unloading a barge from Ternium (Depo. Robert B. Miller, III, p. 90, l. 2-6).

140. Mr. Miller was not aware that Ted Knight started unloading the barge after Daniel Vazquez had told him to wait until Mr. Vazquez could get up to the Port (Depo. Robert B. Miller, III, p. 90, l. 7-11).

141. Mr. Miller is not aware of a single fact that Daniel Vazquez did or said that caused damages to Miller Barge (Depo. Robert B. Miller, III, p. 90, l. 15-20).

142. Mr. Miller is not aware of any individual he believes may have been employed by Ternium that did or said anything that caused damages to Miller Barge (Depo. Robert B. Miller, III, p. 90, l. 25 – p. 91, l. 20).

VI. **Documents (Exhibit F)**

143. Attached hereto as Exhibit F is a copy of the contract between Caddo and Ternium authenticated by Daniel Vazquez as Exhibit 24 A, B & C in his deposition.

          Respectfully submitted,

          MAYER, SMITH & ROBERTS, L.L.P.
          Attorneys for TERNIUM, USA, Inc.

By:  *s/Caldwell Roberts, Jr.*
          Caldwell Roberts, Jr., Bar No. 20343
          8570 Business Park Drive, Suite 200
          Shreveport, LA  71105
          Telephone:  (318) 222-2135
          Facsimile:  (318) 222-6420
          colly@msrlaw.com

## **C E R T I F I C A T E**

I HEREBY CERTIFY that a copy of the above and foregoing has been filed electronically with the Clerk of Court using the CM/ECF system and has been sent to all known counsel of record by operation of the court's electronic filing system, e-mail, facsimile, or by placing same in the United Sates mail properly addressed and with adequate postage prepaid thereon.

Shreveport, Louisiana, this 19th day of April, 2023.

*/s/ Caldwell Roberts, Jr.*